Filed 11/27/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re O.D., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE, Plaintiff and Respondent, v. O.D., Defendant and Appellant. | A136370 (Contra Costa County Super. Ct. No. J11-0812) |

O.D. appeals from juvenile court orders finding that he committed first degree burglary and declaring him to be a ward of the court. He argues that the court wrongly admitted expert testimony about a palm print implicating him in the burglary and that there was insufficient evidence to sustain the burglary finding. We disagree and affirm.

I.
FACTUAL AND PROCEDURAL
BACKGROUND

On October 30, 2009, Marlene R. left her Antioch house at 7:30 a.m. after making sure the doors and windows were locked. When she returned at 3:30 that afternoon, she found "mail strewn about in the entryway and hallway" and a bedroom window open. She realized that something was wrong and called the Antioch police. Jewelry, money, iPods, and a camera were missing, and someone had unplugged her flat-screen television and stereo equipment and moved a television and other electronic equipment next to the back door.

1

Antioch police officer Blair Benzler responded to Marlene R.'s call. He identified the open bedroom window as the burglar's likely point of entry. The window was accessible only from the house's backyard, and it was not visible from the street. The glass in the window was unbroken, but the screen was cut. Several smudges and fingerprints were on the glass. Benzler suspected that the burglar avoided breaking the glass by forcing the window past the locking mechanism. He lifted several prints from the window, including a palm print on the outside of the glass. At the time of the burglary, Marlene R. lived alone and did not know O.D.

A week after the burglary, O.D. was arrested in an unrelated matter and fingerprinted.

In mid-2010, a fingerprint examiner with the Contra Costa Sheriff's Department Crime Laboratory, Stephanie Souza, examined the palm print from Marlene R.'s window. She submitted the print to a computerized search on a state database of fingerprints. After the search generated possible matches, Souza compared the palm print taken from Marlene R.'s window with O.D.'s prints taken at the time of his unrelated arrest and concluded that the palm print was O.D.'s.

In January 2011, an Antioch police officer questioned O.D. about the burglary. O.D. denied any knowledge of it and claimed to have no memory of being near Marlene R.'s house in 2009.

About five months later, the Contra Costa County District Attorney filed a petition under Welfare and Institutions Code section 602, subdivision (a) seeking to have O.D. declared a ward of the court. The petition alleged that O.D. had committed one count of first degree burglary by entering a house with intent to commit larceny and a felony.[1] (Pen. Code, §§ 459, 460, subd. (a).) Before the jurisdictional hearing, O.D. moved to exclude Souza's testimony. He contended that this testimony would be improper under *People v. Kelly* (1976) 17 Cal.3d 24 (*Kelly*) because there was no longer "general acceptance" of fingerprint comparison "in the relevant scientific community." (*Id.* at

---

[1] The petition was twice amended to add other counts that were unrelated to the burglary and are not at issue in this appeal.

p. 30.)  In support of his motion, O.D. submitted two affidavits from research scientists and a copy of a presentation by the Honorable Harry T. Edwards on a 2009 report by the National Academy of Sciences (Edwards, The NAS Report on Forensic Sciences:  What It Means for the Bench and Bar (May 6, 2010) (Edwards Presentation) [conference paper discussing National Academy of Sciences report]), all of which questioned the reliability and validity of fingerprint comparisons for identification purposes.[2]

The jurisdictional hearing took place in the spring of 2012.  The court heard Souza's testimony while taking the motion to exclude it under advisement.  Souza testified that in identifying the print from Marlene R.'s window as O.D.'s, she used the ACE-V (analysis, comparison, evaluation, verification) fingerprint-examination method.  The first step of the ACE-V method (analysis) is to determine whether the print is sufficiently detailed to be usable for comparison purposes.  The next step (comparison) is to compare the print to another known print.  The third step (evaluation) is to evaluate and deduce whether the prints match based on their similarities and differences.  The final step (verification) is to have another analyst verify the conclusion.

Souza testified that, in accordance with this method, she determined that the palm print from Marlene R.'s window was usable, selected comparison points on the print, and submitted the print to a search on a California Department of Justice fingerprint database.  This search generated 15 potential matches in Alameda and Contra Costa Counties, ranked according to how closely they matched the print Souza submitted.  O.D. was ranked first on the list of potential matches.  Souza then compared the palm print taken from Marlene R.'s window with O.D.'s prints taken at the time of the unrelated arrest.  She explained that her laboratory required examiners to find at least eight points of similarity and no unexplainable discrepancies before making an identification.  She

_____

[2] Although the defense requested the juvenile court take judicial notice of the full National Academy of Sciences report, a copy of the report was not submitted to the court. The court did not rule on the request for judicial notice, and the report does not appear in the record.  (See Evid. Code, § 453, subd. (b) [requiring party seeking judicial notice under Evid. Code § 452 to "furnish[] the court with sufficient information to enable it to take judicial notice of the matter"].)

identified 11 points of similarity between the print taken from Marlene R.'s window and O.D.'s print taken at the time of the unrelated arrest, and she determined that they matched. Two other fingerprint examiners verified her conclusion. Copies of the palm print from Marlene R.'s window and O.D.'s prints were introduced into evidence.

The defense cross-examined Souza at length. Souza acknowledged that fingerprint comparison is "subjective," that there is no established error rate, and that no studies suggest that the process is infallible. She testified that she was familiar with research critiquing the ACE-V method and that she was aware of various cases in which fingerprint comparison resulted in false identifications.

In its case, the defense argued that it would have been unlikely for O.D. to have been near Marlene R.'s house at the time of the burglary. It pointed out that O.D. walked to school, which was only .08 miles from his home, and that Marlene R.'s house was 1.8 miles from his home and 2.5 miles from his school. The defense also pointed out that O.D. was not marked absent from school on the day of the burglary and had signed a contract setting his school hours as 8:45 a.m. to 3:15 p.m.

At the close of evidence, the court denied the motion to exclude Souza's testimony after hearing argument on it and then sustained the burglary allegation. At the dispositional hearing, the court declared O.D. to be a ward of the court and placed him at the Orin Allen Youth Rehabilitation Facility for nine months.

## II.
### DISCUSSION

A.   *The* Kelly *Rule Does Not Apply to Fingerprint-Comparison Testimony.*

O.D. argues that Souza's testimony was inadmissible because it failed to satisfy *Kelly, supra*, 17 Cal.3d 24. While a trial court's decision to admit expert testimony generally is reviewed under the abuse of discretion standard, we review de novo any conclusions of law on which the trial court's ruling rests. (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773.) We conclude as a matter of law that the ACE-V method of fingerprint comparison is not the type of scientific technique governed by *Kelly*. Thus, we affirm the trial court's admission of Souza's

4

testimony because O.D. does not argue that the evidence should have been excluded for any reason other than its failure to satisfy *Kelly*.

In *Kelly*, the California Supreme Court adopted the rule of *Frye v. United States* (D.C.Cir. 1923) 293 F. 1013 (*Frye*) governing the admissibility of expert testimony that relies on "a new scientific technique." (*Kelly*, *supra*, 17 Cal.3d at p. 30.)[3] When a party seeks to introduce evidence relying on a new scientific technique, *Kelly* requires the party to show "general acceptance of the new technique in the relevant scientific community" as well as the witness's qualification as an expert and use of "the correct scientific procedures" in employing the technique. (*Ibid.*) These requirements, which we shall refer to as "the *Kelly* rule," apply in juvenile court because they arise out of "rules of evidence established by the Evidence Code and by judicial decision." (Welf. & Inst. Code, § 701.)

The primary purpose of the *Kelly* rule is "to protect the jury from techniques which, though 'new,' novel, or 'experimental,' convey a ' "misleading aura of certainty." ' " (*People v. Stoll* (1989) 49 Cal.3d 1136, 1155-1156.) This danger arises when techniques "seem scientific and infallible, but . . . actually are not." (*People v. Webb* (1993) 6 Cal.4th 494, 524.) The *Kelly* rule "is intended to forestall the jury's uncritical acceptance of scientific evidence or technology that is so foreign to everyday experience as to be unusually difficult for laypersons to evaluate." (*People v. Venegas* (1998) 18 Cal.4th 47, 80.) "Because the inventions and discoveries which could be considered 'scientific' have become virtually limitless," the determination whether expert testimony relies on a " 'scientific technique[]' " is made in light of this "narrow 'common sense' purpose" of protecting the trier of fact from techniques that misleadingly convey

---

[3] The United States Supreme Court has since concluded that *Frye, supra*, 293 F. 1013 was superseded by the adoption of the Federal Rules of Evidence and that a different standard applies to the admission of expert testimony. (*Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993) 509 U.S. 579, 586, fn. 4.) But our Supreme Court has affirmed that in California state courts, *Kelly* still governs the admissibility of expert testimony that relies on a new scientific technique. (*People v. Leahy* (1994) 8 Cal.4th 587, 591-592.)

certainty. (*Stoll* at pp. 1155-1156.) The *Kelly* rule is frequently inapplicable to expert testimony because the testimony is often neither based on a new scientific technique nor likely to convey an aura of certainty. "[A]bsent some special feature which effectively blindsides the jury, expert opinion testimony is not subject to *Kelly*." (*Stoll* at p. 1157.)

In their original briefing, the parties primarily disputed whether fingerprint comparisons are still "generally accepted" under the *Kelly* rule. On our request, they submitted supplemental briefing on the question whether testimony regarding the ACE-V method of fingerprint comparison is governed by *Kelly*. Respondent argues that the *Kelly* rule is inapplicable to the ACE-V method of fingerprint comparison because, regardless whether it is generally accepted, fingerprint comparison is not the type of scientific technique *Kelly* governs since it can easily be understood by nonexperts and is unlikely to convey a misleading aura of certainty. (*People v. Stoll*, *supra*, 49 Cal.3d at p. 1156.) We agree. Our Supreme Court, in *Venegas,* expressly distinguished DNA evidence, which is subject to *Kelly*, from "*fingerprint*, shoe track, bite mark, or ballistic comparisons, which [laypersons] essentially can see for themselves." (*People v. Venegas*, *supra*, 18 Cal.4th at pp. 80-81, italics added.)

Here, Souza testified that the process of comparing prints is a "visual" one, and the juvenile court was able to see the palm prints being compared and observe their similarities. In addition, there was no suggestion that the prints were tampered with or altered. (See *People v. Farnam* (2002) 28 Cal.4th 107, 160 [*Kelly* inapplicable to computer system used to generate potential fingerprint matches where no tampering or alteration alleged]; *People v. Webb*, *supra*, 6 Cal.4th at p. 524 [*Kelly* inapplicable to chemical and laser process to produce image of fingerprint left on duct tape where no dispute that resulting image was unaltered].)

Souza's testimony was particularly unlikely to convey a misleading aura of certainty because Souza openly acknowledged that fingerprint comparisons are inherently subjective and that no study establishes their infallibility. She also made clear that it was her opinion—not an established scientific fact—that the palm print on Marlene R.'s window matched O.D.'s. "When a witness gives [her] personal opinion on the stand—

6

even if [she] qualifies as an expert—[laypersons] may temper their acceptance of [her] testimony with a healthy skepticism born of their knowledge that all human beings are fallible." (*People v. McDonald* (1984) 37 Cal.3d 351, 372-373 [holding that *Kelly* does not apply to expert testimony relying on eyewitness identification], overruled in part on other grounds by *People v. Mendoza* (2000) 23 Cal.4th 896, 914.)

Accordingly, we conclude that the comparison of fingerprints is not the type of "scientific technique" that *Kelly* governs. (*Kelly*, *supra*, 17 Cal.3d at p. 30.) Souza's testimony did not need to satisfy *Kelly*'s requirements in order to be properly admitted.[4]

O.D. acknowledges that fingerprint comparison has a long history of acceptance as one of the strongest forms of identification evidence. (See, e.g., *People v. Farnam*, *supra*, 28 Cal.4th at p. 160; *People v. Johnson* (1988) 47 Cal.3d 576, 601). But he refers to the Edwards Presentation to argue that new questions about the reliability of fingerprint comparisons warrant reconsideration of whether the ACE-V method is generally accepted under *Kelly*. We agree that when *Kelly* applies (i.e., when the scientific technique at issue conveys an aura of uncertainty and is one that laypersons cannot independently evaluate) courts should revisit whether the technique remains

---

[4] Many states no longer follow the standards announced in *Frye, supra*, 293 F. 1013. (*Annot., Post-*Daubert *Standards for Admissibility of Scientific and Other Expert Evidence in State Courts* (2001) 90 A.L.R.5th 453, 454-455.) Courts in states that follow *Frye* have treated expert evidence about fingerprint comparisons differently. At least three have assumed that their state's version of *Frye* applies and have held that fingerprint analysis is generally accepted. (See, e.g., *People v. Luna* (Ill.App. 2013) 989 N.E.2d 655, 670-671, 679 [proper for trial court to take judicial notice that ACE-V method is generally accepted in relevant scientific community]; *State v. Dixon* (Minn. 2012) 822 N.W.2d 664, 672-674 [state met burden of establishing ACE-V method generally accepted in relevant scientific community]; *Markham v. State* (Md.App. 2009) 984 A.2d 262, 266, 273-274, 276 [fingerprint-comparison evidence admissible without *Frye*-type hearing because it is generally accepted].) At least one other state has held, as we hold here, that fingerprint comparison is not the type of scientific technique that is to be analyzed under *Frye*. (*Barber v. State* (Ala.Crim.App. 2005) 952 So.2d 393, 417 ["[B]ecause print identification involves subjective observations and comparisons based on the expert's training, skill, or experience, we conclude that it does not constitute scientific evidence and that, therefore, *Frye* does not apply"].)

7

generally accepted when " 'new evidence is presented reflecting a change in the attitude of the scientific community.' " (*People v. Doolin* (2009) 45 Cal.4th 390, 447.) But this principle is beside the point here because the ACE-V method of fingerprint comparison conveys no aura of certainty and therefore does not implicate *Kelly* in the first place.[5]

Because *Kelly* is inapplicable, we need not consider O.D.'s arguments under *Kelly*'s other two prongs, which require a showing that the witness is qualified to be an expert and used the correct scientific procedures in employing the new technique. (See *People v. Farnam*, *supra*, 28 Cal.4th at p. 160 & fn. 27.) In any event, O.D. did not raise these arguments below, and he has not argued that the evidence of the print comparison was subject to exclusion on any other basis. (See *People v. Kaurish* (1990) 52 Cal.3d 648, 688 [finding failure to preserve challenges to admissibility of evidence relying on scientific technique].)

Finally, we note that our holding that the *Kelly* rule is inapplicable to the ACE-V method of fingerprint comparison does not mean that this type of expert testimony will inevitably be admissible in every case. The admissibility of expert testimony about the ACE-V method of fingerprint comparison is properly evaluated under Evidence Code section 801, which requires the testimony to be related "to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact," and be "of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject." Whether these standards have been met in any particular case will, of

---

[5] We are aware of no decision that has excluded fingerprint-comparison evidence on the basis that it is either unreliable or no longer generally accepted. Decisions from other jurisdictions have uniformly rejected the argument that the NAS Report warrants exclusion of fingerprint-comparison evidence. (See, e.g., *United States v. Rose* (D.Md. 2009) 672 F.Supp.2d 723, 725-726; *People v. Luna*, *supra*, 989 N.E.2d at pp. 674-678; *State v. Dixon*, *supra*, 822 N.W.2d at pp. 673-674; *Commonwealth v. Gambora* (Mass. 2010) 933 N.E.2d 50, 58-60.) The report does not suggest that " 'fingerprint evidence is so unreliable that courts should no longer admit it.' " (*Luna* at p. 674, quoting *Gambora* at p. 58.) And the report acknowledges that " '[b]ecause of the amount of detail available in friction ridges, it seems plausible that a careful comparison of two impressions can accurately discern whether or not they had a common source.' " (*Luna* at p. 674.)

course, depend upon the facts and circumstances.  In this case, however, O.D. did not argue below and does not argue on appeal that Souza's testimony failed to satisfy these standards.  We therefore affirm the juvenile court's admission of this evidence.

B.    *Substantial Evidence Was Presented to Sustain the Burglary Allegation.*

O.D. argues that even if Souza's testimony was properly admitted, there was insufficient evidence to support the trial court's finding beyond a reasonable doubt that he committed first degree burglary.  We disagree.

To evaluate this claim, we apply the substantial-evidence standard, which requires us to " ' "review[] the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find [the elements of the crime] beyond a reasonable doubt." ' "  (*In re George T.* (2004) 33 Cal.4th 620, 630.)  "A conviction for first degree burglary . . . requires 'entry' of an 'inhabited dwelling house' with the intent to commit a felony."  (*People v. Thorn* (2009) 176 Cal.App.4th 255, 261; see Pen. Code, §§ 459, 460, subd. (a).)

O.D. first argues that the juvenile court failed to apply the reasonable-doubt standard in sustaining the burglary allegation.  (See *In re Eddie M.* (2003) 31 Cal.4th 480, 487 ["[F]ederal due process requires proof beyond a reasonable doubt when juveniles are charged with crimes"].)  O.D. points to the juvenile court's comment, in sustaining the burglary allegation, that the evidence of the palm-print comparison "strongly suggest[ed]" that O.D. was the perpetrator of the burglary.  But O.D. ignores the court's subsequent finding on the record that the burglary allegation was true "beyond a reasonable doubt."

O.D. also argues that because fingerprint evidence is not "infallible," it is not possible to say that the palm print left on Marlene R.'s window was "definitely" his.  But proof beyond a reasonable doubt does not require proof beyond any possible doubt, " 'because everything relating to human affairs is open to some possible or imaginary doubt.' "  (Pen. Code, § 1096.)  Souza testified that she followed established procedures

9

in making the palm-print comparison. Her conclusion that the palm print on Marlene R.'s window was O.D.'s was substantial evidence that O.D. was the burglar. (See *People v. Tuggle* (2012) 203 Cal.App.4th 1071, 1076 ["under California law, it is established that fingerprints are strong evidence of identity and ordinarily are sufficient, without more, to identify the perpetrator of a crime"]; see also *People v. Johnson*, *supra*, 47 Cal.3d at p. 601.)

Finally, O.D. argues that the palm print's placement on the outside of the open window fails to establish that he entered Marlene R.'s house even assuming the palm print was his. "Several cases have held that evidence of a fingerprint, palm print, or footprint left inside a structure or at a point of unusual access is alone sufficient to support a burglary conviction. [Citations.]" (*People v. Bailes* (1982) 129 Cal.App.3d 265, 282.) In *Bailes*, for example, the only evidence tying the defendant to the burglary was a thumbprint "found on a bathroom window screen that had been bent to allow access." (*Ibid.*) The court held that it was reasonable to infer that "[the defendant] had left his print in the process of burglarizing the residence." (*Ibid.*) Here, there was no plausible explanation for why O.D.'s print was on Marlene R.'s window other than that he participated in the burglary. It was eminently reasonable to infer that O.D. left his palm print on the window in the process of forcing it open to burglarize Marlene R.'s house. (See *ibid.*)

III.
DISPOSITION

The judgment is affirmed.

_____
Humes, J.

We concur:

_____
Reardon, Acting P.J.

_____
Rivera, J.

10

Trial Court:               Contra Costa County Superior Court

Trial Judge:               Honorable Barry Baskin

Counsel for Appellant:     Anne Hanson Mania, under appointment by the First
                           District Appellate Project

Counsel for Respondent:    Kamala D. Harris, Attorney General, Dane R. Gillette,
                           Chief Assistant Attorney General, Gerald A. Engler,
                           Senior Assistant Attorney General, Eric D. Share,
                           Supervising Deputy Attorney General, Sharon
                           Birenbaum, Deputy Attorney General